**In re INTERNATIONAL RY. CO.**

No. 36453.

United States District Court
W. D. New York.

July 25, 1949.

Homer H. Woods, Buffalo, N. Y. (Francis J. Maloney and Arnold T. Olena, Buffalo, N. Y., of counsel), for Trustees.

George Zolotar, New York City (Frederick T. Finnegan, New York City, of counsel), for Securities & Exchange Commission.

Chadbourne, Wallace, Parke & Whiteside, New York City (W. Hugh Peal, New York City, of counsel), for Manufacturers Trust Co.

White & Case, New York City (Jesse E. Waid and Edward J. Kenn, New York City, of counsel), for Bankers Trust Co.

Kenefick, Cooke, Mitchell, Bass & Letchworth, Buffalo, N. Y. (Edward H. Letchworth and John H. Hollands, Buffalo, N. Y., of counsel), for Bankers Trust Co.

Scribner & Miller, New York City (Louis Bernstein, New York City, of counsel), for Bondholders' Protective Committee.

Hellings, Ulsh, Morey & Stewart, Buffalo, N. Y. (William I. Morey, Buffalo, N. Y., of counsel), for Bondholders' Protective Committee.

Simpson, Thacher & Bartlett, New York City (Hamilton C. Rickaby and Frederick Sussman, New York City, of counsel), for G. Louise Robinson de Dombrowski, et al.

Morey, Schlenker & Murray, Buffalo, N. Y. (David Murray and Joseph Morey, Jr.,

Buffalo, N. Y., of counsel), for Harry P. Schaub, representing certain individual bondholders.

Warren W. Johnson, Jamestown, N. Y., for Lipsett, Inc.

Adrian Block, Buffalo, N. Y., for certain tort claimants.

Fred C. Maloney, Buffalo (Elmer S. Stengel and Leonard Schoenborn, Buffalo, N. Y., of counsel), Corporation Counsel for City of Buffalo.

James A. Noonan, Lockport, N. Y., Corporation Counsel of City of Lockport.

Thomas J. O'Donnell, Buffalo, N. Y., for Selby C. Parker.

Alfred L. Hetzelt, Buffalo, N. Y., for John Montana.

William G. Conable, Buffalo, N. Y., for Erie R. Co.

Franklin R. Brown, Buffalo, N. Y., for New York Central R. R. Co.

George M. Donohue, Niagara Falls, N. Y., for City of Niagara Falls, New York.

Daniel B. Shortal, Buffalo, N. Y., for Division 1386 and Division 1342 of the Amalgamated Association of Street Electric Railway and Motor Coach Employees of America.

Regis O'Brien, Buffalo, N. Y., for Bondholders' Protective Committee.

Penney, Penney, Buerger & Siemer, Buffalo, N. Y. (Charles P. Penney, Buffalo, N. Y., of counsel), for Bondholders' Protective Committee.

KNIGHT, Chief Judge.

This is a proceedings to determine whether the Plan of Reorganization of International Railway Company, Debtor, as amended, proposed by the Trustees, John W. Van Allen and Henry W. Keitzel, should be approved as fair, equitable and feasible and as complying with the provisions of Section 216 of the Bankruptcy Act, 11 U.S.C.A. § 616.

This plan has been developed as a result of the efforts during the past two years of the Trustees and representatives of the bondholders and of the accident claimants. It has been the subject of extensive hearings before this Court during the past eight months. It has been approved by the Public Service Commission of the State of New York. The Securities and Exchange Commission recommends approval of the Plan with the addition of the amendment hereinafter discussed. The Interstate Commerce Commission has considered the Plan and offers no objections. The Bureau of Internal Revenue advises that it will recommend the Plan to the Secretary of the Treasury of the United States.

The Plan provides for a reorganized Company to be owned solely by those who are now bondholders or other creditors of the Debtor. With the purchase of the 300 new buses recently ordered, the reorganized Company will have assets of approximately $14,000,000. It will have a net worth according to its books of approximately $5,000,000. Of the $14,000,-000 of assets over $8,000,000 will be represented by new buses purchased within three years. The new equipment will permit the Reorganized Company to render excellent service to the public and to operate efficiently and profitably. The Reorganized Company will have a sound capitalization. It will have only one class of stock. Its major indebtedness will consist of equipment obligations payable over a period of years at interest rates varying from 2¾% to 4% per annum. It will have a new Board of Directors. The former control of the so-called "Robinson" interests which, prior to July 28, 1947, had existed for thirty years will be eliminated.

The distribution of the securities of the Reorganized Company gives effect to the rights of the various classes of creditors. The participation accorded bondholders and accident claimants was the result of extensive negotiations between representatives of these groups and a compromise of their differences with the thought that a prompt reorganization rather than extensive litigation would be in the best interest of all concerned. Approval of this method of arriving at the participation to be accorded each group of creditors has been expressed by the United States Supreme Court. Case v. Los An-

geles Lumber Products Co., Ltd., 308 U.S. 106, 130, 60 S.Ct. 1, 84 L.Ed. 110.

Evidence introduced at the hearings on the Plan is to the effect that with the new buses recently ordered the earnings of the Reorganized Company will support the securities to be issued by it. This evidence was based on the existing rates of fare which are considerably lower than the rates charged in many other major cities.

█ I am satisfied and find that the Plan is fair, equitable and feasible and have approved the Plan as complying with the provisions of Section 216 of the Bankruptcy Act, and directed that the Plan be submitted to creditors.

The petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S. C.A. § 501 et seq., was filed by the International Railway Company on July 28, 1947. For many years prior to July 28, 1947 the Public Service Commission of the State of New York and others urged the reorganization of International Railway Company on the ground that it was insolvent and because of insolvency could not render adequate service. In March of 1947 the Legislature of the State of New York amended the Public Service Law of that state, Consol.Laws, c. 48, § 119, to authorize the Public Service Commission to direct the officers of an insolvent public utility to file a petition for reorganization under Chapter X. Following the enactment of this Act the Public Service Commission initiated proceedings to force the officers of International Railway Company to file such a petition. These proceedings were opposed by the Company. In the meantime, because of operating losses the International Railway Company had sought rate increases from the Public Service Commission. In July of 1947 the Public Service Commission authorized an increase in rates of fare on conditions which the International Railway Company could not meet. Faced with this situation the International Railway Company capitulated and on July 28, 1947 filed a petition for reorganization under Chapter X of the Bankruptcy Act.

The first objective of the Commission and others had then been accomplished and the jurisdiction of this Court had been invoked for the purpose of effecting a reorganization of International Railway Company under and in accordance with the federal laws relating to bankruptcy.

The present preferred and common stockholders of International Railway Company can and will receive nothing for their stock as the company is insolvent. This leaves two major groups interested in the reorganization, the riding public and the creditors, including bondholders, accident claimants and the City of Buffalo. The riding public must be considered because they will be the customers of the Reorganized Company and no company can succeed without the good will of its customers obtained through the rendering of good service at reasonable rates. On the other hand, the interest of creditors, including bondholders, accident claimants and the City of Buffalo, must also be considered in any reorganization because they are the real owners of the property.

At the time the petition for reorganization was filed on July 28, 1947, the outlook for the creditors and for the riding public was a dismal one. Operations for the previous six months had been at a loss of more than $235,000 before depreciation, retirements, provisions for rail removal and bond interest. After all charges, the loss for the six months' period had been approximately $1,000,000. Current operations were at an even greater loss, for wage increases had been granted effective July 1, 1947 which would increase labor costs by approximately $600,000 per year. A substantial portion of the purchase price of 71 new buses which had been delivered late in 1946 and early 1947 was to become due within the next ten months and had to be refinanced if the buses were to be retained in service. Fifty additional buses had been ordered for delivery in the fall of 1947 at a cost of approximately $760,000, for which funds were not available. The acknowledged liabilities of the International Railway Company, exclusive of capital stock and reserves, were in excess of $15,000,000 as compared with assets carried on its books at a value of ap-

proximately $10,000,000. In addition there were approximately 1,500 claims for wrongful death or injuries to person or property. These were carried on the books at approximately $700,000 but the total amount claimed was over $7,500,000. The International Railway Company was under obligation to the City of Buffalo to substitute motor vehicles on the eight streetcar lines then operated in the City of Buffalo and to remove the rails and resurface the track area. The International Railway Company was operating streetcars built in the years 1912–1918, some old gas-electric buses approximately twenty years of age, and a large number of small buses approximately ten years of age. This old equipment and the small buses were the subject of severe criticism by the public and the Public Service Commission and were expensive to operate. The cost of substituting buses for streetcars, of removing the rails and resurfacing the track area and of substituting new and larger buses for the 25-passenger buses was estimated at $9,000,000 to $10,000,000. Rates of fare were inadequate but the Public Service Commission was adamant that there should be no increase in rates of fare without an improvement in service through the purchase of new and modern equipment.

To remedy this situation four major steps had to be taken: The first step was the purchase of new equipment. The purchase of new equipment would increase riding and would result in a material saving in operating expenses. It would meet one of the major conditions imposed by the Public Service Commission for an increase in rates of fare. The second step was the refinancing over a period of years of the maturing equipment obligations on buses recently purchased. The third step was an increase in rates of fare. From June 30, 1945 to July 1, 1947 labor costs alone had increased about $2,500,00 per year and in addition there had been a substantial increase in the cost of materials and supplies. No company could absorb these increases in cost without an increase in the rates of fare. The last step was the

elimination of excessive debt. The International Railway Company since its inception had been plagued by too much indebtedness. The position of the bondholders and the general creditors had to be shifted from that of creditors to that of stockholders if a sound reorganized company were to result from these proceedings.

Two years have elapsed since July 28, 1947, and through the efforts of the Trustees and the cooperation of the Public Service Commission, the Securities and Exchange Commission and representatives of the various classes of creditors, the outlook for the riding public and for creditors has improved materially. Operations for the first three months of this year showed a profit before depreciation of approximately $168,000. The 50 buses ordered for delivery in the fall of 1947 were purchased and 85% of the purchase price financed over a period of six years at an interest rate of 2¾% per annum. 100 additional new buses were purchased in the fall of 1947 and additional new buses were purchased in the fall of 1947 and the spring of 1948 and 75% of the purchase price financed over a period of six years at an interst rate of 3% per annum. The $620,000 becoming due in 1948 on the 71 buses previously purchased by the International Railway Company was refinanced over a period of five years at an interest rate of 2¾% per annum. Rate increases were granted by the Public Service Commission which were estimated to increase revenues by approximately $2,000,000 per year. Buses were substituted for streetcars on two of the eight streetcar lines in the City of Buffalo. Orders have recently been placed for 300 additional new buses in order to permit the substitution of buses on the remaining streetcar lines in the City of Buffalo and also to replace the 25-passenger buses which cannot be economically operated. It is estimated that the purchase of these new buses will increase earnings by approximately $2,000,000 per year. Arrangements for the financing of the purchase price of these buses have been made with

the Metropolitan Life Insurance Company on the basis of payment by the Trustees or the Reorganized Company of 10% of the purchase price at the time of delivery and the balance over a period of six years with interest at the rate of 4% per annum. With the purchase of this new equipment $8,600,000 will have been spent for new equipment within the past three years and 70% of the seats offered to the public by the Reorganized Company will be on buses purchased within three years. To complete the picture, a plan of reorganization has been developed which has been found to be in the interest of the public and of creditors.

In spite of the complexities of the situation, the Trustees' Plan of Reorganization is a relatively simple one. The Reorganized Company is to carry on the passenger transportation business of the International Railway Company. The international toll bridge, the freight line and other properties not useful in such business are to be sold and the proceeds of the sale applied on the purchase price of new equipment. The Reorganized Company is to issue 325,000 shares of capital stock and these are to be distributed to bondholders and general creditors.

There are five major groups of creditors. The holders of Refunding bonds, the holders of Buffalo Traction bonds, the holders of bus accident claims, the holders of streetcar accident claims and the City of Buffalo. Each of these groups is described in the Plan.

The "strict-priority rule" enunciated in Northern Pacific R. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, an equity receivership case, has been held to apply to Chapter X proceedings. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 1943, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; see, also, Case v. Los Angeles Lumber Products Co., Ltd., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. This rule requires that "full compensatory provision must be made for the entire bundle of rights" which any creditor or class of creditors may surrender. Consolidated Rock Products Co. v. Du Bois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. This rule has been followed in the participation according each group of creditors under the Trustees' Plan.

A determination of the "bundle of rights" of each group of creditors involved many difficult questions of law and fact. There were serious questions as to the extent of the coverage of the mortgage securing the Refunding bonds and the extent of the mortgage securing the Buffalo Traction bonds. The Buffalo Traction bonds are secured by a mortgage made by the Buffalo Traction Company in 1898. The Buffalo Traction Company was one of the predecessors of the International Railway Company and its bonds were assumed by the International Railway Company at the time the International Railway Company was organized. Of the property originally subject to the Buffalo Traction mortgage, only a nominal amount remains today. It was doubtful whether or not the Buffalo Traction mortgage constitutes a lien upon property of the International Railway Company other than the property which the International Railway Company acquired from The Buffalo Traction Company in 1902. There were serious questions as to the value of the mortgaged assets and the value of the unmortgaged assets. There were serious questions as to whether the bus accident claims and the streetcar accident claims were secured by a deposit of $400,000 made by the International Railway Company in May of 1947 "to assure" payment of claims arising out of the operation of "motor vehicles". All of these questions and many others were the subject of extensive negotiations between representatives of the various groups of creditors and counsel for the Trustees. In these negotiations counsel for each group urged upon the others the rights of the creditors represented by him and the compensation which should be provided in the Plan for the surrender of such rights. As a result of these negotiations a compromise of the divergent views involved was reached and a stipulation was entered into setting forth

the relative rights to be accorded each group in the Plan of Reorganization.

Under this stipulation the following conclusions were reached for the purpose of preparing a plan of reorganization:

(1) The shares of capital stock to be issued by the Reorganized Company are to be distributed between mortgage bondholders and the unsecured creditors in accordance with the value of the mortgaged property as compared with the value of the unmortgaged property.

(2) The property subject to the mortgage securing the Refunding bonds is to be valued at $5,681,000, the property subject to the mortgage securing the Buffalo Traction bonds is to be valued at $55,000 and the unmortgaged property is to be valued at $838,000.

(3) The claim of the holders of Refunding bonds is to be allowed at $13,265,882.95. This represents the principal amount of the Refunding bonds outstanding in the hands of the public and all unpaid interest thereon at the rate of 5% per annum to July 28, 1947. In 1938 over 99% of the holders of these bonds had consented to a reduction of the fixed interest rate on their bonds to 3% and had agreed that the remaining 2% be on a contingent basis. Under the stipulation the additional 2% in interest is allowed as a part of the claim of the holders of the Refunding bonds.

(4) The claim of the holders of the Refunding bonds is to be classified as a secured claim to the extent of the value of the property subject to the mortgage securing said bonds and as an unsecured claim to the extent that the total amount of their claims exceeds the value of the security. Accordingly, the holders of the Refunding bonds are classified in the Trustees' Plan as secured creditors to the extent of $5,681,000 and as unsecured creditors to the extent of $7,584,882.95.

(5) The claim of the holders of the Buffalo Traction bonds is to be allowed at $118,602.82 consisting of the aggregate principal amount of said bonds outstanding in the hands of the public and unpaid interest thereon at the rate of 5% per annum

to July 28, 1947. The property subject to the mortgage securing said bonds is to be valued at $55,000 and accordingly the claims represented by said bonds are classified under the Trustees' Plan as secured claims in this amount and as general claims for the balance of $63,602.82.

(6) The bus accident claims are to be classified as secured claims to the extent of $300,000, being three fourths of the deposit of $400,000 made by the International Railway Company with the Marine Trust Company of Buffalo in May of 1947 to assure payment of claims arising out of the operation of motor vehicles. It was agreed that for their secured claim the holders of the bus accident claims should receive $150,000 in cash and $150,000 of notes of the Reorganized Company payable over a period of seven years with interest at the rate of 3% per annum. The balance of the bus accident claims is to be classified as general claims.

(7) The streetcar accident claims are to be classified as secured claims to the extent of $100,000, being 25% of the said deposit at The Marine Trust Company of Buffalo, and for this secured claim the holders of streetcar accident claims are to receive $50,000 in cash and $50,000 of notes of the Reorganized Company payable over a period of seven years with interest at the rate of 6% per annum. The balance of the streetcar accident claims is to be classified as general claims.

These conclusions were embodied in the Trustees' Plan of Reorganization. In the opinion of this Court they represent a reasonable compromise of the many difficult questions involved and the application of the principles previously mentioned to the reorganization of the International Railway Company.

As a result of the application of the principles discussed, the mortgage bondholders will receive for their claims, secured and unsecured, approximately 97% of the capital stock of the Reorganized Company. The holders of the accident claims will receive $200,000 in cash, $200,000 in notes of the Reorganized Company payable over a

period of seven years, with interest at the rate of 3% per annum, and 2,472 shares of the capital stock of the Reorganized Company. Over 1,500 claims for injuries to person or property arising out of the operation of streetcars and buses prior to July 28, 1947 were filed in this proceeding. The amount at which these claims are to be allowed in the proceeding has been determined in respect of substantially all of these claims. The total amount allowed to date for these claims is approximately $1,-100,000.

The City of Buffalo on July 28, 1947 had three claims against the International Railway Company. Under franchises granted by the City the International Railway Company is required to pay the City 3% of its gross receipts from operations within the City. As of July 28, 1947, the International Railway Company owed the City $128,000 representing a portion of the last annual payments under the franchises. The Trustees accorded the City priority in respect to this claim by paying the same in full in cash shortly after they were appointed. The Trustees have continued to pay the City of Buffalo the annual charges payable under the franchises from the City.

The City of Buffalo had a claim for unpaid taxes of approximately $75,000. This claim is also given preference, for under the Trustees' Plan all taxes are to be assumed by the Reorganized Company and paid in cash over a period of years. The Trustees have paid all taxes accruing since their appointment on July 28, 1947. By the end of next month they will have paid the City of Buffalo in franchise charges and taxes a total of approximately $1,250,000.

On July 28, 1947, there were eight streetcar lines in operation in the City of Buffalo. In 1940 when there were thirteen streetcar lines the City and the International Railway Company entered into an agreement providing for the substitution of motor vehicles on all streetcar lines. Under this agreement application for such substitution was to be made to the Public Service Commission prior to October 1, 1950 and as streetcar operations were discontinued the International Railway Company was to remove the rails and resurface the

track area at the rate of eight miles per year. The City filed in this proceeding a claim for the cost of removing the rails and resurfacing the track area on all streetcar lines in the City on July 28, 1947. This claim has been allowed in these proceedings at $2,031,549. The claim as filed by the City states that the City has no security for the claim. Accordingly, under the Trustees' Plan this claim is classified as an unsecured or general claim.

The City of Buffalo does not object to the preference accorded its claim for taxes and its claim for annual payments due under the franchises but objects to the classification of its claim for the removal of rails and resurfacing the track area as an unsecured or general claim. The City in the course of the proceedings requested that this claim be accorded preference over the claim of the mortgage bondholders. However, the mortgage bondholders have a mortgage on the property of the company and the City does not have security for its claim. The City also urged that this claim be given a preference over the accident claims. But the City cited no rule of law or equity which would require the claims of the persons who were injured in accidents prior to July 28, 1947 to be subordinated to the claim of the City for the removal of rails and resurfacing the track area. The claim of the City was properly classified as an unsecured or general claim. Village of Stillwater v. Hudson Valley R. Co., 1931, 255 N.Y. 144, 174 N.E. 306; In re Madison Railways Co., 7 Cir., 1939, 102 F.2d 178 and 7 Cir., 1940, 115 F.2d 586.

The City seeks to force preferential treatment by a threat to revoke as against the Reorganized Company those franchises which contain the obligation to remove the rails and resurface the track area. Counsel for the City states—and properly so—that the Trustees' Plan for Reorganization is not feasible if the City can revoke the franchises as against the Reorganized Company, notwithstanding the participation of this claim of the City in the reorganization. This question of the right of the City to revoke its franchises is an issue in these proceedings.

The term "claim" is defined in Chapter X to include all claims of whatsoever character against a debtor or its property, except stock, whether or not such claims are provable under Section 63 of the Bankruptcy Act, 11 U.S.C.A. § 103, and whether secured or unsecured, liquidated or unliquidated, fixed or contingent. The claim of the City was properly filed in this proceedings pursuant to the order of this Court fixing the date on or before which claims were to be filed against the Debtor. On the basis of the claims filed, the Plan of Reorganization was developed and subsequent steps taken in the reorganization proceedings. The City filed a general notice of appearance in the fall of 1947 and since then has participated in the reorganization proceedings. The City for this claim, along with the mortgage bondholders and the accident claimants for the unsecured portion of their claims, will become an owner of the Reorganized Company through the distribution of stock of the Reorganized Company. The City cannot for this claim become a stockholder and at the same time retain the right to enforce payment of the claim against the Reorganized Company any more than the mortgage bondholders can receive 97% of the stock of the Reorganized Company for their claims and at the same time retain the right to foreclose their mortgage.

The Plan provides that the property dealt with by the Plan—and the term "property" is defined in the Plan to include franchises —shall be free and clear of all claims and interests of creditors except as provided in the Plan or in the order confirming the Plan. Any attempt on the part of the City to revoke the franchises as against the Reorganized Company would be inconsistent with and contrary to the Plan of Reorganization. In the course of the proceedings counsel for certain creditors proposed an amendment to the Plan specifically stating that the City of Buffalo could not participate in the reorganization proceedings in respect of this claim and at the same time retain the right to revoke the franchises as against the Reorganized Company. I denied this amendment on the ground that the Plan was to be so interpreted without the necessity of an amendment. Chapter X contains provisions for the protection of creditors. Any creditors not satisfied with the Plan must act within its provisions.

The decision of this Court is that the City of Buffalo cannot participate in these reorganization proceedings in respect to its claim for removing rails and resurfacing the track area and at the same time retain as against the Reorganized Company the right to revoke its franchises for failure to pay such claim in cash in full.

The City of Buffalo urged that the treatment accorded its claims for the removal of rails and resurfacing the track area is unfair because it will place upon abutting property owners one third of the expense of removing the rails and resurfacing the track area. Counsel for the Trustees replied that under the charter of the City of Buffalo the cost of repaving is not to be borne by abutting property owners where the repaving is on main thoroughfares or park approaches and that the remaining streetcar lines in the City of Buffalo, with only minor exceptions, are on park approaches or on streets which the Common Council has designated as main thoroughfares or can be so designated as they are in fact main thoroughfares.

Counsel for the City of Buffalo also urged that the cost of removing rails and resurfacing the track area is an operating expense. In other words, the cost should be borne by the riding public. The total franchise charges payable annually to the City of Buffalo and the taxes payable annually to the City of Buffalo and other taxing bodies aggregate in excess of $1,500,-000 per year. This burden on the users of the public transportation system in Buffalo is already twice as heavy as that imposed by many other cities.

The City of Buffalo also urged that the Trustees by operating the new Amherst Street and the new South Buffalo Crosstown bus routes in the City of Buffalo assumed this obligation to remove the rails and resurface the track area. However, I do not read the consents granted for the Amherst Street route and the South Buffalo Crosstown bus route to this effect.

The City of Buffalo also urged that a plan of reorganization would have more chance of success if new capital were introduced. This suggestion overlooks the fact that under the Trustees' Plan approximately $5,000,000 of new equity capital is provided by the bondholders and other creditors.

The City of Buffalo also urged that the cost of removing the rails and resurfacing the track area on Clinton and Sycamore Streets is to be regarded as an expense of administration since the substitution of buses for streetcars on these streets was made by the Trustees. However, as pointed out in an earlier opinion, extraordinary expenditures of this character are not properly chargeable to the estate. Westinghouse Electric Manufacturing Company v. Barre & Montpelier Traction & Power Co., 98 Vt. 130, 126 A. 594.

Under the Trustees' Plan the City of Buffalo receives at last a modern transportation system. With the purchase of the 300 new buses recently ordered, 70% of the seats offered to the riding public will be on buses purchased within three years. The City of Buffalo has been accorded preference in respect of two of its three claims. In respect of the claim for removal of rails and resurfacing the track area it is accorded the same treatment as that accorded the unsecured portion of the claim of the mortgage bondholders and the unsecured portion of the accident claims. In considering the fairness of the Plan to the City of Buffalo, the treatment accorded other creditors must be considered and it must not be overlooked that the bondholders in respect to their secured as well as unsecured claims, aggregating in excess of $13,000,000, and the accident claimants in respect of their unsecured claims of approximately $800,000 are to receive only stock in the Reorganized Company. Currently payments by the Trustees to the City of Buffalo under the provisions in the franchises requiring the payment to the City of 3% of the gross receipts from operations within the City are running at the rate of $335,000 per year. These annual payments are in addition to heavy taxes. No reduction in these payments is required under the Trustees' Plan. The Trustees urge that these will be more than sufficient to pay the cost of any damage to the City streets and over a period of years to pay the cost of removing the rails and resurfacing the track area if applied by the City to such purpose. I am satisfied and find that the treatment accorded the City of Buffalo under the Trustees' Plan is eminently fair and equitable.

The Securities and Exchange Commission in its first report suggested six minor amendments to the Plan. Three of the amendments have been adopted. Of the remaining three one was satisfactory to the Trustees but did not meet with the approval of the Public Service Commission and accordingly has not been adopted. The other two did not meet with the approval of the Trustees or the Public Service Commission. The Securities and Exchange Commission in its supplemental report urges that the plan be amended to provide for the payment of certain interest coupons which had matured prior to July 28, 1947 and for which the holders had failed to collect payment. These coupons aggregate approximately $54,000. $42,444 of these coupons would have been paid if they had been presented for payment at maturity. Some of these coupons have been outstanding since 1915. It is not known why the holders failed to present them for payment. The remaining coupons were owned by bondholders who did not sign the concurrent instrument which was signed by more than 99% of the holders of Refunding bonds in 1938, and which reduced the fixed interest rate from 5% to 3% and placed the remaining 2% on an income basis. The holders of such coupons could have taken steps to enforce payment. Under the mortgage indenture securing the bonds, funds set apart for the payment of interest were not trust funds. Accordingly, the holders of such coupons cannot be preferred over other claims for unpaid interest on the mortgage bonds.

The Securities and Exchange Commission cites in support of its recommendation the case of In re Rocky Mountain Fuel Co., 10 Cir., 152 F.2d 747. The plan of reorganization in that case provided that certain interest coupons be paid in cash. How-

·ever, the question on appeal was whether the plan in respect of certain other provisions was fair to the holders of these coupons and not whether the provision for the payment of the coupons in cash was fair to other creditors. All questions concerning the rights of the mortgage bondholders were involved in the extensive negotiations between the representatives of the mortgage bonds and representatives of the accident claims. The representative of the accident claims participating in these negotiations has objected to this amendment. Unless approved by him, this amendment could not be adopted without reopening the entire negotiations.

In the course of the proceedings Bankers Trust Company, the Trustee under the mortgage indenture securing the Refunding bonds, filed objections to the Plan. A number of these objections are answered by the evidence introduced in the proceedings. Reference need be made to only two of them: ·(1) that under the Trustees' Plan the holders of the Refunding Mortgage bonds receive no adequate compensation or fair equivalent for the surrender of their lien position, and (2) that income mortgage bonds should be issued by the Reorganized Company to the extent of at least ·60% of the value of the property covered by the lien of the Refunding mortgage. ·Counsel for the Bankers Trust Company ·and counsel for two bondholders' protective committees representing the Refunding bonds participated in the negotiations with ·counsel for the accident claims. It may be ·assumed that they urged in these negotiations that the holders of the mortgage bonds ·should receive adequate compensation or a fair equivalent for the surrender of their lien position. A compromise reached under which mortgage bondholders will receive 97% of the stock of the Reorganized Company would appear to give the holders of the mortgage bonds adequate compensation for the surrender of their lien position. The Public Service Commission and the Securities and Exchange Commission strongly disapprove the issuance of income bonds for reasons which are sound. It need only be said that the issuance of income bonds by the Reorganized Company would be re-

peating the errors of the past, would weaken the Reorganized Company and this would not be in the interest of bondholders.

An order approving the Plan and providing for the manner of voting on the Plan is submitted herewith.